**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JASMINE TAYLOR,<br>on behalf of herself and a class, | ) <br>) <br>) | 13-cv-2886 |
| Plaintiff, | ) <br>) | Judge John J. Tharp, Jr. |
| vs. | ) <br>) | Magistrate Judge Arlander Keys |
| SCREENING REPORTS, INC., | ) <br>) | |
| Defendant. | ) | |

**FIRST AMENDED COMPLAINT – CLASS ACTION**

1.     Plaintiff Jasmine Taylor brings this action against Screening Reports, Inc., a supplier of specialized consumer reports (credit reports) to landlords, to secure redress for improper information on her consumer report and reckless and irresponsible reporting procedures.  Plaintiff alleges violation of the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq. ("FCRA").

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §1681p .

3.     Venue in this District is proper because defendant is located in this District.

**PARTIES**

4.     Plaintiff, Jasmine Taylor, is a resident of Cook County, Illinois.

5.     Defendant Screening Reports, Inc., is an Illinois corporation with offices at 220 Gerry Dr., Wood Dale, IL 60191.

6.     Defendant Screening Reports, Inc., describes its business as follows on its web site, http://www.screeningreports.com/index.cfm: "Screening Reports is your single-source provider of comprehensive, accurate, and cost-effective rental background search services designed exclusively for the multi-family housing industry."  Defendants issues some 800,000 reports each year.

1

7.     The same web site further states, http://www.screeningreports.com/about.cfm,
"Welcome to Screening Reports Inc., a national provider of background screening service to the
multi-family housing industry. Our product line offers screening products for affordable,
conventional, and student housing properties. [P] Background screening services consist of
previous rental verification and employment verification, consumer credit reports, landlord
tenant eviction reports, criminal reports, sex offender reports and OFAC search. This
information is used to determine eligibility for apartment residency by landlords and
management companies."

8.     Defendant  furnishes its reports for monetary compensation.

9.     Defendant is a consumer reporting agency as defined in the FCRA.

10.    Defendant describes the reports it furnishes as follows:

**Our Services**

At Screening Reports Our Difference Is Key

Screening Reports is your single-source provider of accurate, cost-effective and comprehensive rental background searches. Applicant screening and selection is one of the most important responsibilities property owners and managers face on a daily basis. Make sure you're getting the most complete, in-depth and up-to-date information available in the marketplace today.

We work directly with you to design an optimal screening program based on your specific needs, time frame and criteria. Both our customized applicant scoring and multi-family screening models allow you to consistently identify qualified applicants by using any or all of the following screening criteria:

**National Credit Report**

Including Credit Risk Score and Screening Summary

**Criminal Record Investigation**

National Sex Offender Registry, Instant Statewide Criminal Reports, OFAC Terror Search, and Multi-County Criminal Reports researched by SRI's own investigators in-person at county courthouses

**Crime Alert Service**

Notification when a resident is arrested for a felony or misdemeanor including: driving offenses, in-process files, noise complaints, possession of a controlled substance, MFG/DEL controlled substance and deceptive practice

**Court Eviction Report**

Including eviction filings and eviction judgments

**Social Security Search**

Including year of issue, additional aliases (AKA's) and addresses

**Employment Verification**

Including start and end dates, salary history and title check for current and previous employment

**Rental History Verification**

Including previous rental information, move in and move out dates, monthly rent, rental payment timeliness, damages and complaints

(http://www.screeningreports.com/service.cfm)

11.     Defendant touts the accuracy of its eviction information and claims to actually

examine the court records:

**Eviction Record Investigations**

Unlock critical information regarding an applicant's previous rental performance. Not available in

standard Equifax, Experian, and TransUnion credit reports; court eviction reports may be a useful predictor of an applicant's future rental outcome. For example, a record of past court actions, not limited to evictions, against an applicant, may suggest a higher level of risk that the applicant may not satisfactorily fulfill his/her lease obligations.

Our detailed information, taken directly from the court record includes:

Defendant Name and Address

Case Type, Date and Number

Case Status, Claim Amount and/or Judgment

Plaintiff/Petitioner Name and Telephone Number

Court/County

Our court eviction reports are supported by leading edge technology and unsurpassed customer service. Whether you choose a customized applicant scoring model, designed with your specific guidelines in mind, or an accredited multi-family risk model, our reports allow you to analyze eviction records and provide clear accept/decline guidelines based on your established criteria. This ensures consistent decision making, improves Fair Housing compliance, and relieves your staff from having to interpret criminal reports and other subjective data.

(http://www.screeningreports.com/service-eviction.cfm)

## **FACTS**

12.    Plaintiff resided at 7750 S. Saginaw, Chicago, Illinois with her grandparents from her birth until she was 23 years old.

13.    At no time has plaintiff had any ownership interest in the property at 7750 S. Saginaw, Chicago, Illinois.

14.    At no time has plaintiff violated or been alleged to have violated any obligation under any lease relating to the property at 7750 S. Saginaw, Chicago, Illinois.

15.    Years after plaintiff left the address, Bank of America foreclosed a mortgage on the property at 7750 S. Saginaw, Chicago, Illinois.

16.    In 2012, Bank of America filed an eviction proceeding against the residents of 7750 S. Saginaw, Chicago, Illinois.

17.    Plaintiff was named in the eviction proceeding.

18.    Plaintiff neither resided in the property nor had any obligation to pay rent or other money relating to the property.

4

19.     On information and belief, based on statements by the attorney for Bank of America, plaintiff was named in the eviction proceeding because she once lived there.

20.     The eviction file was sealed in order to protect plaintiff.

21.     Before the eviction file was sealed and before the "return date" when plaintiff was required to appear, the existence of the eviction was reported on plaintiff's consumer report by Screening Reports, Inc.

22.     The eviction file was sealed on February 14, 2013.

23.     Because of the large number of foreclosures of rental properties in recent years, *2011 Chicago Foreclosure Report, Three Year Impact Assessment: Apartment Building Foreclosures and the Depletion of Rental Housing in Chicago*, Lawyers Committee For Better Housing (Exhibit B), it is quite common for someone to be named in an eviction proceeding even though they have not violated any obligation under a lease.

24.     Defendant knows this fact.

25.     Evictions resulting from foreclosures are or should be readily apparent from the court file, in that the plaintiff is a mortgage company or the trustee of a mortgage securitization trust.  The eviction involving Ms. Taylor was brought by such a trustee.

26.     In 2013, plaintiff sought to rent an apartment from Bogs Management, Inc.

27.     Bogs Management, Inc., obtained a consumer report on plaintiff from Screening Reports, Inc.

28.     The report (pertinent portions attached as Exhibit A) stated that plaintiff had been the subject of an eviction action brought by "Bank America Natio/ LaSalle Bank Nat" with reference to the property at 7750 S. Saginaw Ave., and gave a date of 12/20/2012 and a case number, 12-M1-731655.

29.     The report listed that the "disposition" of the action had been "eviction."

30.     The report also listed 7750 S. Saginaw as an address associated with plaintiff, without providing any dates.

5

31.     No judgment of eviction was or could have been entered against plaintiff on the date of defendant's report.

32.     Defendant's report was false and inaccurate.

33.     On information and belief, defendant failed to review the court file to determine whether a judgment of eviction had been entered.

34.     Eviction case records are often sealed to protect defendants, such as Ms. Taylor, who are named in the proceeding even though they have not violated or even claimed to have violated any obligation under a lease or contract.

35.     It is materially misleading for defendant to report on an eviction case in which no judgment had been entered without disclosing that material fact.

36.     As a result of defendant's  report, plaintiff was unable to rent an apartment.

37.     Plaintiff suffered embarrassment and humiliation.

38.     Plaintiff also suffered economic injury as a result of being unable to rent the apartment she desired and expenditure of time and money looking for an apartment and dealing with defendant's false report.

## COUNT I – FAIR CREDIT REPORTING ACT

39.     Plaintiff incorporates paragraphs 1-38.

40.     Under the FCRA, 15 U.S.C. §1681e, defendant is required to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

41.     Preparing a report referring to an eviction without recording the fact that plaintiff was not alleged to have defaulted on any obligation under a lease does not comply with the standard of "maximum possible accuracy," particularly when the stated purpose of obtaining the information is that it "suggest[s] a higher level of risk that the applicant may not satisfactorily fulfill his/her lease obligations."

42.     The fact that some other person defaulted on a note and mortgage does not

"suggest a higher level of risk that the applicant may not satisfactorily fulfill his/her lease obligations," and the inclusion of an eviction based on such circumstances, given defendant's stated reason for such inclusion, is a false and misleading representation.

43.     Preparing a report referring to an eviction case and listing the "disposition" as "eviction" when no judgment had been entered against the subject of the report does not comply with the standard of "maximum possible accuracy," particularly when the stated purpose of obtaining the information is that it "suggest[s] a higher level of risk that the applicant may not satisfactorily fulfill his/her lease obligations."

44.     On information and belief, defendant's report on plaintiff was prepared according to defendant's normal practices and procedures for preparing reports on individuals.

45.     On information and belief, defendant regularly reports eviction cases relating to individuals without regard to whether the individual defaulted, or even was alleged to have defaulted, on any obligation under a lease.

46.     Defendant negligently or willfully violated 15 U.S.C. §1681n and/or §1681o.

47.     Section 1681n provides:

> **§1681n.  Civil liability for willful noncompliance**
>
> **(a) In general.  Any person who willfully fails to comply with any requirement imposed under this title  with respect to any consumer is liable to that consumer in an amount equal to the sum of–**
>
>> **(1)**
>>
>>> **(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $ 100 and not more than $ 1,000; or**
>>
>> **(2) such amount of punitive damages as the court may allow; and**
>>
>> **(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court. . . .**

48.     Section 1681o provides:

> **§1681o.  Civil liability for negligent noncompliance**

**(a) In general. Any person who is negligent in failing to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of--**

> **(1) any actual damages sustained by the consumer as a result of the failure;**
>
> **(2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.**

## CLASS ALLEGATIONS

49. Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), plaintiff brings this action on behalf of two classes.

50. The first class consists of (a) all natural persons (b) who were the subject of a consumer report prepared or provided by defendant (c) on or after a date two years prior to the filing of this action, (d) which report noted the existence of an eviction (e) where the person who was the subject of the report was not alleged to have violated any obligation under a lease (f) without specific disclosure of that fact.

51. The second class consists of (a) all natural persons (b) who were the subject of a consumer report prepared or provided by defendant (c) on or after a date two years prior to the filing of this action, (d) which report noted the "disposition" of a case as "eviction" (e) where no judgment had been entered against the person who was the subject of the report at the time of the report (f) without specific disclosure of that fact.

52. The class members are so numerous that joinder is impracticable. On information and belief, there are more than 40 members of each class.

53. There are questions of law and fact common to the class members, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether defendant's practices violate the standard of maximum possible accuracy.

54. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

8

55.     Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and class action cases.

56.     A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.   Many consumers  may not realize that their rights are violated.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class members and against defendant for:

>    (1)     Statutory damages;
>
>    (2)     Punitive damages;
>
>    (3)     Actual damages;
>
>    (4)     Attorney's fees, litigation expenses and costs of suit;
>
>    (5)     Such other or further relief as the Court deems proper.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Rupali R. Shah
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603-3593
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

## **NOTICE OF LIEN AND ASSIGNMENT**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
   & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

10

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on May 7, 2013, a true and accurate copy of the foregoing document was filed via the Court's CM/ECF system and notification of such filing was sent to the following parties:

Joseph Shaw Messer
Messer & Stilp Ltd
166 West Washington, Ste 300
Chicago, IL 60602
messer@messerstilp.com


s/ Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Rupali R. Shah
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

**EXHIBIT A**


## Screening Reports

**Phone 866.389.4042**
**Fax 866.389.4043**

**Bogs Management, Inc**
Bogs Property Management

Phone: (708) 895-1411
Fax: (708) 895-7642

| Applicant Name | Date In | Report ID | Report Type |
|---|---|---|---|
| JASMINE TAYLOR | 02/12/2013 08:43 AM | | Standard |

Credit Score: **0** (TransUnion)

# JASMINE TAYLOR

Birthdate: XX/XX
Social Security #: XXX-X

Current Address:

| Identity Verification | JASMINE TAYLOR |
|---|---|

SOCIAL SECURITY NUMBER ISSUED IN ILLINOIS (XXX-XX

### Names and AKAs

JASMINE TAYLOR
JASMINE T TAYLOR
JASMIN T TAYLOR
TAYLOR JASMINE
JASMIN TAYLOR

Redacted

7750 S SAGINAW AV    CHICAGO    IL    60649

Redacted

| Eviction Records | | | JASMINE TAYLOR |
|---|---|---|---|
| Plaintiff Disposition | | County Address | Date Case Number |
| BANK AMERICA NATIO/LASALLE BANK NAT EVICTION | | COOK 7750 S SAGINAW AV 1F CHICAGO IL | 12/20/2012 12-M1-731655 |

Redacted

<u>EXHIBIT B</u>

LAWYERS' COMMITTEE FOR BETTER HOUSING

THREE YEAR IMPACT ASSESSMENT—

APARTMENT BUILDING FORECLOSURES AND THE DEPLETION OF RENTAL HOUSING IN CHICAGO



JULY 2012



**Mark Swartz**
*Legal Director*

**Geneva Morris**
*Tenant Advocate VISTA*

**Patricia Fron**
*Buildings Program Administrator*



Lawyers' Committee for Better Housing (LCBH) advocates for the rights of tenants and to increase and preserve safe, affordable, and accessible rental housing. Since 2008, LCBH's Tenants in Foreclosure Intervention Project (TFIP) has been at the forefront of the foreclosure crisis as the only project in the Chicago area that provides a full spectrum of legal services for renters encountering the myriad complications caused by the foreclosure of rental buildings. TFIP staff, in addition to providing legal representation and foreclosure counseling to tenants, facilitate trainings and educational workshops about federal, state, and municipal foreclosure law to a variety of stakeholders. These efforts support and enhance the work of both housing counselors and community-based organizations engaged in foreclosure prevention and outreach programs to assist Chicago's renters. For more information about LCBH, visit www.lcbh.org.

### Acknowledgements

LCBH's Tenants in Foreclosure Intervention Project is sustained through the generous support of the following funders: The Chicago Community Trust, Polk Bros. Foundation, City of Chicago, Cook County, Field Foundation, Chicago Bar Foundation, Illinois Bar Foundation, and Illinois Equal Justice Foundation.



## DEFINITIONS

**Apartment Building:** Building containing one or more residential rental unit(s), not including single-family homes and condominiums (see methodology section for further details).

**Community Area:** 77 designated areas of the City of Chicago with fixed boundaries.

**Constructive Eviction:** The refusal of a landlord or successor-in-interest to honor a tenant's right of possession through illegal lockouts, board-ups, utility shut-offs, and, for the purposes of this report, poor utility maintenance and misleading communications designed to intimidate the renter into leaving her/his home.

**REO:** "Real Estate Owned" or bank-owned properties. A term the mortgage industry uses for properties deeded to the lending institution at the judicial sale when there is no successful third-party bidder.

**Successor-in-interest:** Person or entity who takes ownership or control of a building, for the purposes of this report, occurring specifically through the confirmation of a foreclosure sale.

**Cash for Keys:** Offers by banks or their agents for building occupants to receive cash in exchange for surrendering keys and vacating the property.

## TABLE OF CONTENTS

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Data Review 2009-2011. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Issue 1—Individual Renter Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Issue 2—Community Area Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Issue 3– City Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Issue 4– Lender Accountability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20



**Figure 1:** Map showing Newly-Filed Foreclosures on Chicago Apartment Buildings in 2011

## Executive Summary

Apartment Building foreclosures continue to be filed at alarmingly high rates in Chicago, threatening to further reduce the number of available housing units. This has serious implications as Chicago is already facing a rental housing shortage and affordability crisis, the impact of which is felt by individual households, neighborhoods, and the City as a whole.

From 2009-2011 more than 50,000 rental units went into foreclosure in Chicago, comprising nine percent of Chicago's entire rental housing stock. The excessive amount of foreclosure filings has had a resounding negative impact on neighboring properties and entire Community Areas. LCBH also found that more Apartment Building units were impacted by foreclosure filings than are single-family and condominium units in Chicago, indicating that a greater number of renter households are likely affected than are owner households.

In this report, LCBH identifies four core issues correlated with the vast numbers of Apartment Building foreclosures: 1) laws protecting tenants are routinely violated, resulting in the unwarranted eviction or constructive eviction of untold numbers of renters; 2) certain Community Areas are more acutely impacted by Apartment Building foreclosures than others, and these areas tend to be concentrated on the South and West sides of the City; 3) buildings that become bank-owned through foreclosure often lack proper management and end up vacant, leading to the loss of viable rental units and requiring substantial expenditures of municipal funds and services; 4) banks refuse to allow renters to stay in their homes. Clearly, policies must be put in place to ensure that rental units remain available, occupied, and well-maintained. This report makes recommendations to mitigate the impact of foreclosures on the availability of rental units throughout Chicago.

### Findings:

⇒ There were 4,477 newly-filed foreclosures on Chicago Apartment Buildings in 2011 impacting 13,814 units—about 5,000 more Apartment Building units than single-family and condominium units affected during this same time period.

⇒ Of the Chicago Apartment Building foreclosure filings in 2011, about half (2,134) were filed by only five lenders/servicers: Wells Fargo, Bank of America, Chase, US Bank, and Citi Mortgage; whereas in 2010, about a quarter (1,438) were filed by the top five lenders/servicers.

⇒ Of the completed sales in 2011 that matched with newly-filed Apartment Building foreclosures in TFIP's database, 84% resulted in bank ownership.

⇒ Over the past three years, 16,941 Apartment Buildings in Chicago went into foreclosure, containing 51,972 units. 76% of units were in 2-4 units buildings.

⇒ Nearly 1 out of every 10 rental units in Chicago has been impacted by foreclosure in just three years.

⇒ 31 (about 40%) of Chicago's Community Areas had between 10–23% of their individual rental housing stock impacted by foreclosure from 2009-2011.

⇒ On average, over 100 Apartment Buildings in Chicago went into foreclosure each week from 2009-2011.

| **2011** | **2010** | **2009** |
| --- | --- | --- |
| 4,477 Apartment Buildings went into foreclosure within the City; these properties contain approximately 13,814 units | 5,904 Apartment Buildings went into foreclosure within the City; these properties contain approximately 17,467 units | 6,560 Apartment Buildings went into foreclosure within the City; these properties contain approximately 20,691 units |

4

# INTRODUCTION

Lawyers' Committee for Better Housing (LCBH) began creating and distributing weekly foreclosure reports in 2009. These reports function as an "Early Warning System" to alert community-based tenant advocates, as early notification and intervention often lead to better outcomes for renters and neighborhoods. Data gathered for the weekly reports are compiled into annual reports each year in order to provide comprehensive updates on rental foreclosures in Chicago. After tracking foreclosure filings on Apartment Buildings for the past three years, it is apparent that rates of foreclosure filings within a single year cannot be viewed in isolation. The foreclosure crisis is cyclical in nature: a building that underwent foreclosure in 2009 potentially became a bank-owned building in 2010 and a vacant board-up in 2011. The filing of a foreclosure alone, and more so the building vacancy, drives down property values in the surrounding area and depresses the tax base, contributing to further foreclosures. The compounded impact of several years of alarmingly high foreclosure rates has ramifications for individual households, neighborhoods, and the City as a whole.

The impact on individual renters is particularly acute since tenants are often unaware of the foreclosure action against their landlords, as they are generally not parties to the foreclosure, and landlords typically choose not to share this information for fear of losing rental revenue. Oftentimes, tenants only learn of the foreclosure after their landlord has already lost the building, and real estate or bank agents attempt to vacate buildings as expeditiously as possible. Unfortunately, the laws put in place to protect tenants in this situation lack meaningful enforcement mechanisms, and violations of renters' rights occur unchecked. This puts many households in the unwarranted predicament of searching for new housing in an already overburdened and increasingly unaffordable rental housing market, potentially resulting in higher rates of homelessness, and families having to "double-up" or lease unsuitable units. Furthermore, this disruption in living arrangements forces many families to leave their community and move children to new schools. LCBH's 2010 report Banks Avoid Foreclosure Laws, Uproot Renters: A Call for Enforcement of Tenant Protections[1] documents coercive bank practices, and provides sample notices and case vignettes.

Persistently high rates of foreclosure filings on Apartment Buildings, in conjunction with high rates of foreclosure sales resulting in bank-owned or REO buildings, have contributed to a critical rental housing shortage in the City and general disinvestment in many of Chicago's most vulnerable Community Areas. Vacant REO properties often remain in a bank's control for months, even years, since many of these properties, particularly those in areas with plummeting property values, are difficult to sell. Once vacant, these buildings become dilapidated and unmarketable.

Combined, these factors drive disparities in overall community stability. "At the community level, the accumulation of large numbers of foreclosed properties, as well as potential blight tied to vacant and abandoned properties, causes further declines in neighborhood real estate markets that have already experienced significant reductions in local property values."[2] Such declines include the loss of home equity, tax revenue, and community fiscal capacity. For instance, a report examining the impact of foreclosure throughout Cook County found that "[t]he effects of a foreclosed property on the cumulative property values of homes on the same block in the Chicago area has been estimated at a $159,000 decrease per foreclosure."[3]

Not only are individual Community Areas facing the consequences of foreclosure, but the City of Chicago has witnessed an overall loss of rental units.[4] The shortage of rental housing, in conjunction with the increase in renters searching for housing, some of whom were once homeowners in foreclosure, has spurred a housing affordability crisis. In a study of countywide housing data by the Institute for Housing Studies at DePaul University (IHS), the alarming shortage of rental housing was detailed: "The gap between affordable rental housing supply and demand is likely going to grow larger. Taking into account likely demographic changes, household tenure decisions, regional economic conditions, and new construction, the gap in affordable rental units will increase by 233,000 by 2020.[5] The reduction in available rental units, including those attributed to foreclosure-related vacancies, board-ups, and tear-downs, has contributed to a rise in rental rates over the past several years. With rising rent rates that increasingly exceed the cost of home ownership[6], stagnating household income, and the predicted shortage of housing units, many residents may be compelled to search outside of the City for housing.

## METHODOLOGY

LCBH's Tenants in Foreclosure Intervention Project (TFIP) utilizes a third-party data provider, Record Information Services (RIS)[7], to compile data regarding foreclosures in Chicago. Although RIS collects data on *all* newly-filed foreclosures and foreclosure related sales in Cook County, TFIP focuses only on filings coded as "apartment building" or "commercial property" and located in Chicago. In doing so, TFIP removes data corresponding to single-family home and condominium filings. TFIP includes the "commercial" category to ensure that rental units in commercially-coded buildings (particularly larger buildings) and those above commercial stores are not omitted. Once the initial data from RIS is compiled, TFIP searches the Property Index Number (PIN) in Chicago's Community Information Technology and Neighborhood Early Warning System (CityNews)[8] website to determine the number of units and the Community Area for each building. If the data available in CityNews is incomplete, TFIP uses the Cook County Assessor's website[9] to supplement its findings.

On a weekly basis, TFIP updates and disseminates rental foreclosure reports specific to individual Community Areas in order to alert community-based partners of recent Apartment Building foreclosure filings. Using the data informed by the public record, TFIP attempts to make any necessary corrections or clarifying notes. Additionally, TFIP removes commercial property or Apartment Building filings that are listed in CityNews and the Cook County Assessor's website as having zero units. TFIP has also removed multiple filings for the same address. These filings were likely dismissed and then re-filed.

TFIP does not collect information on condominium or single-family home foreclosures. For that reason, TFIP acknowledges some limitations to the methodology of this report, as it is difficult to determine the number of Apartment Building units that may be occupied by owners and conversely the number of single family or condo units that may be occupied by renters. Finally, TFIP cannot determine how many units in the Apartment Buildings are unoccupied, or how many people live in each unit. For that reason, TFIP does not estimate how many renters were impacted by foreclosure in 2011, but instead reports how many *units* in Apartment Buildings were affected.





## DATA REVIEW:

### FORECLOSURES ON APARTMENT BUILDINGS IN 2009-2011

LCBH found a gradual decrease in the number of Apartment Building foreclosure filings from 2009 to 2011. However, this is not indicative of relief for communities or renters. As Figure 3 shows, **foreclosure filings on Apartment Buildings remain persistently high**. On average, 92 Apartment Buildings went into foreclosure per week in 2011. The average number of units affected for every filing is three, meaning 276 Apartment Building units were affected weekly in Chicago. Furthermore, since the resolution of recent lawsuits against several of the nation's largest banks for their role in instituting policies that allowed for the filing of foreclosure complaints without the verification of necessary documents, **foreclosure filing rates for 2012 have already risen dramatically** (see p. 16).

However, yearly figures cannot be assessed in isolation due to the length of the foreclosure process in Illinois. Since Illinois is a judicial foreclosure state, meaning that the foreclosure process is carried out through the court, foreclosures generally last at least a year. The timeline on page 10 demonstrates the typical course of an Apartment Building foreclosure. Further, the time it takes for a foreclosure to conclude has been steadily increasing, with a 26 percent increase from 2009 to 2011.[10] Therefore, buildings that had a foreclosure filing in 2009 may remain "at risk" even today depending upon the result of the foreclosure sale. Foreclosures filed in 2009 that went to sale in 2010 most likely resulted in bank ownership; bank-owned REOs often remain vacant for months and even years. As the City copes with the consequences of foreclosures filed over the past several years, new foreclosure filings continue with no relief in sight.

### FORECLOSURE IN CHICAGO BY THE NUMBERS 2009-2011:



## 16,941

**New Apartment Building foreclosures were filed in the last 3 years.**

## 51,972

**Units were affected by foreclosure filings in the last 3 years.**



**Figure 2**



**Figure 3**

## FORECLOSURE FILINGS: BREAKDOWN BY UNIT

LCBH found that of the newly-filed Apartment Building foreclosures from 2009-2011, 12,844 (76%) were on two-to-four unit buildings. The Institute for Housing Studies at DePaul University (IHS) reports that more than half (53%) of the rental units in low-and-moderate income Community Areas are in two-to-four unit buildings; in many Community Areas, these buildings make up the backbone of the rental housing stock.[11] This is significant since many of these foreclosed properties will become bank-owned, and due to limited financing options for two-to-four unit buildings, may remain vacant and unmaintained for extended periods of time.

In the past, two-to-four unit buildings were commonly purchased by individuals seeking to occupy one unit and rent out the other(s) for supplemental income. However, due to the foreclosure crisis, many owner-occupants have lost their homes and there is a shortage of individuals who are willing and financially able to purchase and occupy such properties. Plummeting property values and safety concerns in neighborhoods with high foreclosure and vacancy rates deter many from considering purchasing these buildings. These concerns are compounded by injudicious bank policies requiring REO properties to be vacant prior to sale.

IHS reports that "there are limited financing options available for investor purchases of two-to-four unit buildings" as "traditionally, the secondary market has not supported financing of investor-owned properties under five units which has significantly restricted the number of lenders able to fund the purchase of two-to-four unit buildings."[12] In lieu of financing options, cash purchases of these buildings predominate. **The accumulation of two-to-four unit vacancies and the emergence of cash purchasing will likely lead to building demolitions and the concentration of non-owner occupied substandard properties in the hands of a limited number of investors.**

Owner-occupancy in two-to-four flats most likely contributed to community investment and stability; with vast vacancies, investment purchasers, and overall community blight, many Community Areas are facing destabilization and are moving away from the traditional ownership patterns that previously made them resilient.



| | 1 unit | 2 units | 3 units | 4 units | 5 units | 6-24 units | 25+ units |
|---|---|---|---|---|---|---|---|
| **2009** | 1261 | 3361 | 1063 | 394 | 45 | 371 | 65 |
| **2010** | 970 | 3228 | 984 | 356 | 32 | 289 | 44 |
| **2011** | 628 | 2444 | 747 | 267 | 27 | 256 | 37 |
| **TOTAL** | 2859 | 9033 | 2794 | 1017 | 104 | 916 | 146 |

Figure 4

## ISSUE 1: LACK OF INFORMATION REGARDING TENANTS' RIGHTS DURING FORECLOSURE

The misrepresentation of tenants' rights during foreclosure continues despite education and outreach by tenant advocates over the past three years. Since many tenants are unaware of their buildings' foreclosure until late in the process and often lack legal savvy and access to legal services, tenants are put in the precarious position of relying on information from real estate agents and bank representatives who disregard tenant protections either purposefully or out of ignorance. The following federal, state, and municipal laws were designed to mitigate housing instability faced by renters in foreclosure.  On the subsequent page is a sample timeline of the foreclosure process indicating the point at which these protections commence.

## Laws Protecting Tenants in Foreclosure

| PTFA | IMFL | RLTO |
|------|------|------|
| FEDERAL LAW | ILLINOIS LAW | CHICAGO LAW |

### PTFA — Federal Law

Protecting Tenants at Foreclosure Act [13]

⇒ Foreclosure does not extinguish tenancy.

⇒ If tenant has a *bona fide* lease, the tenant is entitled to remain in the property for duration of lease (Sec. 702(a)(2)(A)).

⇒ Successor-in-interest to a foreclosed property must provide preexisting tenants with at least 90-days notice before tenants must vacate the property (Sec. 702(a)(1)).

### IMFL — Illinois Law

Illinois Mortgage Foreclosure Law [14]

⇒ Broader protections than Federal PTFA.

⇒ Provides rights to all *occupants* that PTFA does not (735 ILCS 5/15-1701(h)(4)).

⇒ Change in Management Notice: A receiver or the purchaser of the foreclosed property must — within 21 days — make a good faith effort to ascertain the identities of all occupants and serve them with notice that control of the property has changed  and provide information as to whom to contact for repairs.

⇒ A receiver or purchaser who fails to provide the aforementioned notice may not collect rent or terminate an occupant's tenancy for non-payment of rent until providing said notice (735 ILCS 5/15-1508.5 (d)(i)).

⇒ Right to seal foreclosure-related eviction court records (735 ILCS 5/15-1701(h)(5)).

### RLTO — Chicago Law

Residential Landlord and Tenant Ordinance [15]

⇒ Covers all non-owner-occupied buildings and all buildings with more than six units. This includes rental condos and REO properties.

⇒ Within 7 days of being served a foreclosure complaint, an owner or landlord must  disclose the foreclosure action in writing to the tenant (Sec. 5-12-095).

⇒ Successors-in-interest (including a bank) are responsible for the return of the security deposit. The former landlord may also be responsible (Sec. 5-12-030(h); Sec. 5-12-080(e)).



# SAMPLE FORECLOSURE TIMELINE BY MONTH

*Every case is different; this is an example of a foreclosure case's progress,* detailing the implications for both owners and renters. *A building's case may go slower than this timeline, and could be dismissed by the bank at any point in the process.*

**LANDLORD/OWNER**

1st missed mortgage payment

2nd missed payment

3rd missed payment, lender may file a Foreclosure and serves landlord with Foreclosure Complaint

Judgment of Foreclosure

Order of Possession & Order Confirming Sale

Month

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |

Tenant should receive notice of Foreclosure Complaint **7 days** after the landlord is served *(RLTO 5-12-095)*

Tenant should receive notice of change in management within **21 days** of Order of Possession and Confirmation of Sale

*(IMFL 735 ILCS 5/15-1508.5)*

90-Day Notice of intent to terminate tenancy *(PTFA; IMFL)*

Summons to Eviction Court

**TENANT**

*NOTE: Unless a receiver is appointed by the court to manage a building, the landlord/owner remains responsible for the building and entitled to collect rent until losing the building at the **ORDER CONFIRMING SALE**.*

10

## EVICTION FILINGS AND PRACTICES

Although seemingly robust tenant protections have been enacted, tenants are usually unaware of and therefore unable to exercise such rights. This forces tenants to rely on information from the successor-in-interest to their property, often banks and the REO agents they employ. Lenders and their agents and attorneys willfully violate tenants' rights through unscrupulous tactics that directly contradict the laws outlined in the previous section. As evidenced in LCBH's 2010 report, these types of violations are rampant throughout the City and cause thousands of renters to face housing instability and even homelessness.

Over the past decade, there have been two noticeable decreases in eviction filings rates, the most recent of which occurred after 2008. LCBH speculates that this second drop in filings is related to, among other factors, an increase in extra-judicial negotiations and non-judicial or constructive evictions described previously.[16]



**Figure 5**

## CONSTRUCTIVE EVICTIONS

### MISLEADING NOTICES

⇒ Banks often provide inadequate notice regarding the change of control or ownership of the building, leaving tenants susceptible to fraud and harassment.

⇒ Many tenants are left without a point of contact for building repair issues, leading to building deterioration and neglect.

⇒ In an effort to avoid landlord responsibilities, tenants are given written or verbal notices that threaten eviction action, board-ups, and lock changes if the tenants do not leave.

⇒ Tenants' lease rights are often ignored despite the fact that successors-in-interest inherit pre-existing lease terms.

### "CASH FOR KEYS"

⇒ Typically offered without disclosing the background law - in particular, the right to remain in the property for the duration of a lease or at least 90 days.

⇒ Faced with building maintenance issues, lack of resources, and a general misunderstanding of tenant rights, tenants frequently agree to take the offer without the ability to make an informed decision.

⇒ Cash for Keys offers often leave tenants with inadequate time to secure suitable housing and require tenants to effectively sign away the legal rights afforded to them by the PTFA, IMFL, and RLTO, including the right to return of the security deposit.

These issues are fully explored in LCBH's 2010 Report: Banks Avoid Foreclosure Laws, Uproot Renters: A Call for Enforcement of Tenant Protections which includes case vignettes and sample notices.

# ISSUE 2: CONCENTRATION OF APARTMENT BUILDING FORECLOSURE FILINGS BY COMMUNITY AREA

Although Apartment Building foreclosure filings have decreased slightly from 2009 to 2011, the same Community Areas affected most acutely in 2009 and 2010 were again impacted by high rates of new foreclosure filings in 2011. Further, a reduction in foreclosure filings does not necessarily indicate a respite in the foreclosure crisis, but rather may be attributed to diminished housing stock in hard-hit Community Areas.

Figures 6 and 7 show the Community Areas with the highest rates of foreclosure filings and units impacted from 2009-2011.

### COMMUNITY AREAS WITH THE HIGHEST NUMBER OF UNITS IMPACTED



Figure 7

### COMMUNITY AREAS WITH THE MOST FORECLOSURE BUILDING FILINGS



Figure 6

As shown in Figures 6 and 7, certain areas of the City have been burdened with inordinately high foreclosure rates. Further, many of these areas have witnessed an inundation of REOs and vacant Apartment Building board-ups. A community organizer in one of the hardest hit areas describes the impact of years of successive foreclosure filings in his community as follows:

*"The atrocity of apartment foreclosures has created a bleak and desolate vacuum of affordable housing that is destroying the vitality of our neighborhoods and is driving low-income families into a never ending cycle of poverty, desperation and degradation."*

*Elce Redmond, South Austin Coalition Community Council*

## COMMUNITY AREA ASSESSMENT

The following 31 Community Areas had over 10 percent of their total rental units[17] impacted by foreclosure from 2009-2011 (see Appendix for full Community Area Assessment). This means that 1 of every 10 rental units in these Community Areas have been subject to a foreclosure filing in the past three years. Strikingly, the following Community Areas had at least 20 percent of the rental housing stock impacted: Englewood, East Garfield Park, and Humboldt Park. One fifth of the rental units in these areas, all with significant rental stock, have been jeopardized by foreclosure in only three years' time.

| Community Area | # of rental occupied housing units | Units impacted in 2009 | Units impacted in 2010 | Units impacted in 2011 | TOTAL | % of rental units impacted |
|---|---|---|---|---|---|---|
| Englewood | 8,643 | 719 | 547 | 726 | 1992 | 23% |
| East Garfield Park | 4,717 | 453 | 364 | 198 | 1015 | 22% |
| Humboldt Park | 11,125 | 923 | 667 | 620 | 2210 | 20% |
| Avalon Park | 1,058 | 130 | 58 | 16 | 204 | 19% |
| West Garfield Park | 4,873 | 362 | 312 | 241 | 915 | 19% |
| North Lawndale | 9,170 | 590 | 591 | 512 | 1693 | 18% |
| Washington Park | 4,264 | 295 | 280 | 198 | 773 | 18% |
| Brighton Park | 6,095 | 433 | 388 | 275 | 1096 | 18% |
| West Englewood | 5,775 | 482 | 298 | 253 | 1033 | 18% |
| New City | 9,024 | 606 | 492 | 418 | 1516 | 17% |
| Chatham | 9,236 | 711 | 408 | 432 | 1551 | 17% |
| Belmont Cragin | 9,777 | 656 | 526 | 394 | 1576 | 16% |
| Hermosa | 4,002 | 253 | 212 | 160 | 625 | 16% |
| Austin | 20,123 | 1289 | 937 | 914 | 3140 | 16% |
| Gage Park | 3,801 | 238 | 219 | 133 | 590 | 16% |
| South Chicago | 7,174 | 440 | 422 | 250 | 1112 | 16% |
| Chicago Lawn | 8,263 | 483 | 396 | 334 | 1213 | 15% |
| Fuller Park | 831 | 56 | 26 | 37 | 119 | 14% |
| Avondale | 8,578 | 466 | 459 | 263 | 1188 | 14% |
| South Shore | 19,726 | 1370 | 730 | 609 | 2709 | 14% |
| Greater Grand Crossing | 9,118 | 497 | 378 | 371 | 1246 | 14% |
| Auburn Gresham | 8,668 | 342 | 351 | 389 | 1082 | 13% |
| Woodlawn | 8,316 | 328 | 449 | 217 | 994 | 12% |
| West Pullman | 3,208 | 182 | 130 | 70 | 382 | 12% |
| West Lawn | 1,547 | 66 | 82 | 35 | 183 | 12% |
| Archer Heights | 1,537 | 58 | 61 | 58 | 177 | 12% |
| Roseland | 6,022 | 290 | 179 | 221 | 690 | 11% |
| Burnside | 321 | 19 | 15 | 2 | 36 | 11% |
| Washington Heights | 2,295 | 101 | 59 | 80 | 240 | 11% |
| South Lawndale | 12,291 | 440 | 423 | 364 | 1227 | 10% |
| McKinley Park | 2,512 | 88 | 97 | 58 | 243 | 10% |

## ISSUE 3: VACANT BUILDINGS ARE A CITYWIDE PROBLEM

### TRACKING SALES: REO BUILDINGS

LCBH found that of the completed sales in 2011 that matched with newly-filed Apartment Building foreclosures already in TFIP's database, **84 percent had resulted in bank ownership.** Further, the Woodstock Institute finds that 91 percent of foreclosure auctions result in bank-ownership.[18] This high rate of REOs is troubling since bank-owned buildings are typically neglected and left unmanaged despite tenants' rights to live in habitable REO properties. REO properties often end up vacant since tenants either leave due lack of building maintenance, are bought out through cash for keys offers, or are evicted by the bank pursuant to a 90-day notice. Troubled REO buildings then require the expenditure of municipal funds and services that could be used elsewhere. For instance, as shown in Figure 8, there were 15,400 calls to City of Chicago's 311 Hotline to report a building as open and vacant in 2011 — which is roughly 42 calls a day. This is a 148 percent increase from 2010.

In 2010 alone, the city of Chicago spent over $15 million to tear down or board up vacant buildings.[19] Vacant buildings also harm neighboring property values; in Chicago, one foreclosed, demolished building reduces the value of the surrounding 13 properties by $17,000 each.[20] Due to diminished property values, owners lose equity in their properties, further driving foreclosure rates.

A recent report by the Woodstock Institute found that 64 percent of Chicago's REO properties are in African-American communities.[21] These buildings take 25 percent longer to return to productive use than properties in predominantly white communities. Though the report focuses primarily on single-family homes, LCBH infers a similar trajectory for Apartment Building foreclosures in Chicago.

### VACANCIES

Community Areas with the highest foreclosure filing rates are also the most likely to have higher rates of foreclosure sales and REO properties. Buildings in the hardest hit Community Areas are often difficult to sell to third-party buyers because of community disinvestment. Figure 8 shows vacant buildings, including single-family homes, that have been reported to the City of Chicago as open and vacant since January 2011. Although not all of the vacancies can be attributed to foreclosure, the Woodstock Institute found that 70 percent of properties registered as vacant with the City were associated with a foreclosure filing within the last four years.[22] The concentration of vacant buildings on the South and West sides of the city is indicative of the lack of REO maintenance in predominantly African-American and Hispanic/Latino communities and the disparities in sale rates.



**Figure 8:** This map shows buildings reported to the City of Chicago in 2011 as open and vacant. [23]

Figure 9

| PLAINTIFF | # OF FILINGS | # OF UNITS |
|---|---|---|
| Wells Fargo | 548 | 1234 |
| Bank of America (Bank of American & BAC) | 475 | 1027 |
| Chase (JP Morgan Chase & Chase Home Finance) | 535 | 1282 |
| US Bank | 294 | 1104 |
| Citi Mortgage | 282 | 757 |

## ISSUE 4: BANKS REFUSE TO KEEP RENTERS IN THEIR HOMES

Of the 4,477 newly-filed Apartment Building foreclosures in 2011, about half (2,134 or 48%) were filed by five lenders/servicers: Wells Fargo, Bank of America, Chase, US Bank, and Citi Mortgage; whereas in 2010, of the 5,904 newly-filed foreclosures, about a quarter (1,438 or 24%) were filed by the top five lenders/servicers. Further, in Cook County, 50 of the biggest banks, each with over $10 billion in assets, initiated 90 percent of all foreclosures in 2010, while the remaining 950 banks filed only 10 percent of the County's foreclosures.[24]

This is significant because bank policies and practices essentially drive the foreclosure process through control over how rapidly each foreclosure is concluded, and the treatment of tenants living in bank-owned properties post-foreclosure. Of the foreclosures that go to auction, LCBH finds that about 84 percent subsequently become bank-owned, likely owned by one of the larger banks listed in Figure 9.

With fewer banks ultimately putting in place policies that affect thousands of households, there is great risk of harm to renters if those policies are widely detrimental, as has been shown through the constructive evictions detailed in previous sections. Yet there is also great opportunity to impact the rental market through the enactment of policies that reflect community-minded best-practices in bank ownership or REO management (see Recommendations, page 17).

Although some financial institutions have purported to institute policies aimed at keeping renters and homeowners in their homes, notably the Federal National Mortgage Association (Fannie Mae) and Bank of America, these policies simply do not go far enough. Fannie Mae states that it extends a post-foreclosure rental option to tenants in "single-family foreclosed properties" which includes single family homes, condominiums, and two-to-four flats.[25] Through its work with renters, LCBH has only seen this rental option executed with three condominium renters of the over 500 tenants counseled in the past three years. Further, for those who expressed interest in entering into a lease with Fannie Mae, the convoluted process that ensued deterred renters from considering this option. The renters LCBH worked with were contacted by multiple parties, from property managers to brokers, who provided conflicting information and made negotiations very difficult. In the end, not one renter secured a year lease as initially offered; instead they were forced to accept a less secure, month-to-month lease. Similarly, Bank of America is piloting a rental program for homeowners in foreclosure. This pilot program will reach only a small fraction of homeowners in a few select cities, not including Chicago.[26]

Despite the benefits of keeping properties occupied post-foreclosure, the overarching trends of widespread evictions (including constructive evictions) and a lack of consequences for the violation of tenants' rights by banks remain commonplace. Furthermore, the limited programs aimed at keeping renters in their homes were most likely initiated to quell growing backlash towards banks due to the foreclosure crisis. The status quo of renter eviction and building vacancy must change. It simply makes sense for all involved — banks, renters, communities, and municipalities — to keep buildings occupied, viable, and generating rental revenue.

## THE CYCLE OF FORECLOSURE AND DISINVESTMENT REQUIRES INNOVATIVE SOLUTIONS



The impact of foreclosure on individual households, Community Areas, and the City as whole, essentially ensures that the housing crisis will continue unrelentingly unless innovative solutions are proposed to stabilize housing. Foreclosures often lead to vacant REOs which decrease property values, the tax base, and cause safety hazards for area residents. This in turn leads to community disinvestment, further foreclosures, and a diminished housing stock.

Already in 2012 foreclosure filing rates have drastically increased nationally. This trend is also reflected in LCBH's database of Chicago Apartment Building filings. Since a settlement has been reached with some of the nation's biggest lenders regarding lender's lack of diligence in reviewing foreclosure-related paperwork (commonly referred to as the "robo-signing scandal"), **banks are now filing foreclosures at rates not seen since late 2009 and early 2010**. According to RealtyTrac, "Illinois home foreclosure activity rose 29 percent in May of 2012 compared to the previous month and is 54 percent higher than May of 2011."[27]

# RECOMMENDATIONS

## Housing Solutions Through A New City of Chicago Ordinance

While federal and state governments have enacted legislation to protect tenants in foreclosed rental properties, these measures fall short in practice. Tenants remain unprotected from coercion, harassment, and fraud, and banks continue to allow buildings to fall into disrepair, imposing serious risks on the surrounding community. **Further, current laws protecting tenants lack meaningful enforcement provisions and are therefore easily sidestepped.**

LCBH, in conjunction with several other policy, advocacy, and community groups, has drafted a proposed City ordinance—the Keep Chicago Renting Ordinance (KCRO)—that would further supplement tenant protections. Whereas tenants' rights are currently protected until a lease ends or a 90-Day Notice has been served, the KCRO extends renter protections from the time a bank becomes an owner of a foreclosed building until it is sold to a third party purchaser. This allows renters, even those without a written lease, to remain in their home as long as they pay rent, and further incentivizes banks to sell occupied REOs, keeping them in productive use. This policy would minimize building vacancies and stabilize rental stock throughout the City. Further, the KCRO would put in place penalties designed to deter tenants' rights violations, such as constructive evictions.

The proposed ordinance is designed to:

⇒ **Ensure** that foreclosing owners act as responsible landlords by imposing penalties for violating the laws protecting renters.

⇒ **Strengthen** notice requirements to alert renters to their rights under law.

⇒ **Extend** renter protections from the time properties become Real Estate Owned until the property is sold to a third-party purchaser.

⇒ **Prevent** vacant buildings by compelling foreclosing owners to keep buildings occupied.



# KEEP CHICAGO RENTING

As part of a working group convened by Albany Park Neighborhood Council (APNC), TFIP spearheaded the drafting of a city-wide ordinance addressing building vacancies and tenant displacement due to foreclosure.

The Keep Chicago Renting Coalition is comprised of the following organizations: Action Now, Albany Park Neighborhood Council, Brighton Park Neighborhood Council, Chicago Coalition for the Homeless, Kenwood Oakland Community Organization, Logan Square Neighborhood Association, Metropolitan Tenants Organization, Organization of the Northeast, SEIU-HCII, Unite Here Local 1

Drafting and Policy Subcommittee: Business and Professional People for the Public Interest, Lawyers' Committee for Better Housing

# Appendix

| Community Area | # of rental occupied housing units | Units impacted in 2009 | Units impacted in 2010 | Units impacted in 2011 | TOTAL | % of rental units impacted |
|---|---|---|---|---|---|---|
| Albany Park | 11,295 | 266 | 285 | 251 | 802 | 7% |
| Archer Heights | 1,537 | 58 | 61 | 58 | 177 | 12% |
| Armour Square | 3,337 | 10 | 16 | 10 | 36 | 1% |
| Ashburn | 1,136 | 28 | 21 | 10 | 59 | 5% |
| Auburn Gresham | 8,668 | 342 | 351 | 389 | 1082 | 12% |
| Austin | 20,123 | 1289 | 937 | 914 | 3140 | 16% |
| Avalon Park | 1,058 | 130 | 58 | 16 | 204 | 19% |
| Avondale | 8,578 | 466 | 459 | 263 | 1188 | 14% |
| Belmont Cragin | 9,777 | 656 | 526 | 394 | 1576 | 16% |
| Beverly | 1,143 | 21 | 9 | 13 | 43 | 4% |
| Bridgeport | 6,980 | 139 | 133 | 97 | 369 | 5% |
| Brighton Park | 6,095 | 433 | 388 | 275 | 1096 | 18% |
| Burnside | 321 | 19 | 15 | 2 | 36 | 11% |
| Calumet Heights | 1,260 | 49 | 27 | 38 | 114 | 9% |
| Chatham | 9,236 | 711 | 408 | 432 | 1551 | 17% |
| Chicago Lawn | 8,263 | 483 | 396 | 334 | 1213 | 15% |
| Clearing | 2,263 | 40 | 21 | 21 | 82 | 4% |
| Douglas | 9,461 | 40 | 27 | 34 | 101 | 1% |
| Dunning | 3,142 | 74 | 54 | 47 | 175 | 6% |
| East Garfield Park | 4,717 | 453 | 364 | 198 | 1015 | 22% |
| East Side | 2,197 | 70 | 37 | 38 | 145 | 7% |
| Edgewater | 21,172 | 303 | 405 | 333 | 1041 | 5% |
| Edison Park | 958 | 5 | 1 | 0 | 6 | 1% |
| Englewood | 8,643 | 719 | 547 | 726 | 1992 | 23% |
| Forest Glen | 773 | 16 | 19 | 5 | 40 | 5% |
| Fuller Park | 831 | 56 | 26 | 37 | 119 | 14% |
| Gage Park | 3,801 | 238 | 219 | 133 | 590 | 16% |
| Garfield Ridge | 2,448 | 36 | 23 | 28 | 87 | 4% |
| Grand Boulevard | 8,640 | 235 | 261 | 143 | 639 | 7% |
| Greater Grand Crossing | 9,118 | 497 | 378 | 371 | 1246 | 14% |
| Hegewisch | 774 | 8 | 8 | 10 | 26 | 4% |
| Hermosa | 4,002 | 253 | 212 | 160 | 625 | 16% |
| Humboldt Park | 11,125 | 923 | 667 | 620 | 2210 | 20% |
| Hyde Park | 9,809 | 281 | 73 | 50 | 404 | 4% |
| Irving Park | 12,286 | 352 | 341 | 215 | 908 | 7% |
| Jefferson Park | 3,476 | 93 | 95 | 73 | 261 | 8% |
| Kenwood | 6,318 | 68 | 28 | 3 | 99 | 2% |
| Lakeview | 39,841 | 199 | 324 | 356 | 879 | 2% |
| Lincoln Park | 21,432 | 108 | 123 | 83 | 314 | 1% |

## APPENDIX

| Community Area | # of rental occupied housing units | Units impacted in 2009 | Units impacted in 2010 | Units impacted in 2011 | TOTAL | % of rental units impacted |
|---|---|---|---|---|---|---|
| Lincoln Square | 12,834 | 178 | 94 | 85 | 357 | 3% |
| Logan Square | 19,995 | 574 | 609 | 455 | 1638 | 8% |
| Loop | 4,881 | 98 | 0 | 0 | 98 | 2% |
| Lower West Side | 9,484 | 249 | 216 | 248 | 713 | 8% |
| McKinley Park | 2,512 | 88 | 97 | 58 | 243 | 10% |
| Montclare | 1,379 | 33 | 54 | 33 | 120 | 9% |
| Morgan Park | 1,915 | 112 | 16 | 15 | 143 | 7% |
| Mount Greenwood | 872 | 53 | 2 | 5 | 60 | 7% |
| Near North Side | 26,620 | 522 | 321 | 451 | 1294 | 5% |
| Near South Side | 2,923 | 1 | 1 | 8 | 10 | 0% |
| Near West Side | 13,433 | 69 | 114 | 111 | 294 | 2% |
| New City | 9,024 | 606 | 492 | 418 | 1516 | 17% |
| North Center | 8,695 | 96 | 106 | 137 | 339 | 4% |
| North Lawndale | 9,170 | 590 | 591 | 512 | 1693 | 18% |
| North Park | 2,989 | 50 | 37 | 58 | 145 | 5% |
| Norwood Park | 3,063 | 29 | 19 | 25 | 73 | 2% |
| Oakland | 2,058 | 23 | 12 | 3 | 38 | 2% |
| O'Hare | 3,515 | 8 | 12 | 7 | 27 | 1% |
| Portage Park | 10,200 | 350 | 329 | 254 | 933 | 9% |
| Pullman | 1,609 | 11 | 27 | 18 | 56 | 3% |
| Riverdale | 2,486 | 7 | 1 | 1 | 9 | 0% |
| Rogers Park | 20,849 | 554 | 1,080 | 289 | 1923 | 9% |
| Roseland | 6,022 | 290 | 179 | 221 | 690 | 11% |
| South Chicago | 7,174 | 440 | 422 | 250 | 1112 | 16% |
| South Deering | 1,704 | 36 | 14 | 38 | 88 | 5% |
| South Lawndale | 12,291 | 440 | 423 | 364 | 1227 | 10% |
| South Shore | 19,726 | 1370 | 730 | 609 | 2709 | 14% |
| Uptown | 23,279 | 496 | 191 | 229 | 916 | 4% |
| Washington Heights | 2,295 | 101 | 59 | 80 | 240 | 10% |
| Washington Park | 4,264 | 295 | 280 | 198 | 773 | 18% |
| West Elsdon | 1,077 | 31 | 34 | 31 | 96 | 9% |
| West Englewood | 5,775 | 482 | 298 | 253 | 1033 | 18% |
| West Garfield Park | 4,873 | 362 | 312 | 241 | 915 | 19% |
| West Lawn | 1,547 | 66 | 82 | 35 | 183 | 12% |
| West Pullman | 3,208 | 182 | 130 | 70 | 382 | 12% |
| West Ridge | 13,394 | 355 | 375 | 262 | 992 | 7% |
| West Town | 25,107 | 578 | 475 | 435 | 1488 | 6% |
| Woodlawn | 8,316 | 328 | 449 | 217 | 994 | 12% |

19

# NOTES

1. *Banks Avoid Foreclosure Laws, Uproot Renters: A Call for Enforcement of Tenant Protections,* Lawyers' Committee for Better Housing, June 2011 at 1. Available at: http://lcbh.org/programs/tenants-in-foreclosure-intervention-project/.

2. *Paying More for the American Dream IV: The Decline of Prime Mortgage in Communities of Color*, Neighborhood Economic Advocacy Project, May 2010 at 2. Available at: http://www.woodstockinst.org/publications/download/paying-more-for-the-american-dream-iv%3a-the-decline-of-prime-mortgage-lending-in-communities-of-color.

3. Petruszak, John, *South Suburban Chicago Foreclosure Crisis Case Study: Where the Dots Connect*, The John Marshall Law School Fair & Affordable Housing Commentary, 2010 at 4. Available at: http://www.jmls.edu/fairhousingcenter/SSHC-Foreclosure-Study.pdf.

4. *The State of Rental Housing In Cook County*, DePaul University Institute for Housing Studies, November, 17 2011, at 1. Available at: http://www.housingstudies.org/research-publications/state-of-housing/state-rental-housing-cook-county/.

5. *Id.*

6. LaCapra, Lauren Tara , *Apartment rents rise at highest rate since 2007*, Chicago Tribune, July 4, 2012. Available at: http://articles.chicagotribune.com/2012-07-04/business/chi-apartment-rents-rise-at-highest-rate-since-2007-20120704_1_apartment-rents-rise-effective-rent-ryan-severino .

7. RIS's website is available at www.public-record.com.

8. CityNews, available at www.newschicago.org, is an internet clearing house of building information for properties in Cook County.

9. The Cook County Assessor's Office website is available at www.cookcountyassessor.com.

10. Buitrago, Katie, *New data illustrate a logjam in Chicago region foreclosure processes*, Woodstock Institute, September 21, 2011. Available at: http://www.woodstockinst.org/blog/blog/new-data-illustrate-a-logjam-in-chicago-foreclosure-processes/.

11. *Two-to-four unit buildings in Cook County's rental market*, DePaul University Institute for Housing Studies, June 13, 2012, at 1. Available at: http://www.housingstudies.org/research-publications/publications/two-four-unit-buildings-cook-countys-rental-market/.

12. *Id.*

13. *Helping Families Save Their Homes Act of 2009 Title VII*, Public Law 111-22, Sections 701-704, *Protecting Tenants at Foreclosure Act* (PTFA) *Dodd-Frank Wall Street Reform and Consumer Protection Act (clarified and extended)*.

14. The *Illinois Mortgage Foreclosure Law* (IMFL) can be found at 735 ILCS 5/15-1101, *et seq.*

15. Municipal Code of Chicago, Title 5 Chapter 12, *Residential Landlords and Tenants Ordinance*.

16. LCBH estimates the number of eviction filings per year by looking at the final forcible entry and detainer case number assigned each year by the Clerk of the Circuit Court of Cook County.

17. U. S. Census Bureau. *Profile of General Demographic Characteristics: 2000.* Available at: http://censtats.census.gov/data/IL/1601714000.pdf .

18. Woodstock data is available at: http://www.woodstockinst.org/factbook/.

19. Li, Roland, *Chicago to 'Vigorously' Defend FHFA Suit Over Vacant Buildings*, International Business Times, December 13, 2011. Available at: http://www.ibtimes.com/articles/266644/20111213/chicago-vigorously-defend-fhfa-suit-vacant-buildings.htm.

20. *Id.*

21. *Roadblock to Recovery: Examining the disparate impact of vacant lender-owned properties in Chicago*, Woodstock Institute, September 2009, at 1. Available at: http://www.woodstockinst.org/research/.

22. *Left Behind: Troubled Foreclosed Properties and Servicer Accountability in Chicago*, Woodstock Institute, January 2011, at 1. Available at: http://www.woodstockinst.org/research/.

23. Addresses and information  for Figure 8 was found on the City of Chicago website. Available at: http://www.cityofchicago.org/content/city/en/depts/bldgs/dataset/vacant_and_abandonedbuildingsservicerequests.html.

24. The Cook County Clerk of Court data is available at: http://ww.cookcountyclerkofcourt.org/.

25. Fannie Mae website and renter information is available at http://www.fanniemae.com/resources/file/help/pdf/rental_faqs.pdf.

26. Harney, Kenneth, *Bank of America hopes underwater homeowners become renters to avoid foreclosure*, The Washington Post, March 23, 2012. Available at: http://www.washingtonpost.com/realestate/bank-of-america-hopes-underwater-homeowners-become-renters-to-avoid-foreclosure/2012/03/19/gIQA4PYdVS_story.html.

27. *U.S. Foreclosure Activity Increases 9 Percent in May*, RealtyTrac, June 11, 2012. Available at http://www.realtytrac.com/content/foreclosure-market-report/foreclosure-activity-trends-in-may-2012---realtytrac-7238.